RUMPKE, District Judge.
[¶1] Box Creek Mineral Limited Partnership (herein "Box Creek") filed suit against BNSF Railway Company (herein "BNSF") for declaratory judgment and to quiet title on the mineral rights in lands conveyed by two deeds in 1913.[1] The parties disputed whether *164 the two deeds passed a fee simple estate from Box Creek to BNSF, thereby conveying the underlying mineral estate, or if the deeds merely conveyed an easement in fee simple, whereby the minerals would not pass to BNSF.
[¶2] The district court found the deeds ambiguous and denied summary judgment. Following a bench trial, the district court found that "the parties intended an easement-like conveyance rather than a fee simple interest." Consequently, the district court quieted title to the mineral estate in Box Creek. BNSF appealed. For the reasons set forth below, we affirm the district court's decision.
ISSUES
[¶3] We agree with Box Creek's statement of the dispositive issues, which we restate as:
1. Did the right of way deeds convey the underlying mineral estates?
2. Did the district court properly admit the testimony of Marc Strahn as expert witness testimony?
PART I
PROCEDURAL HISTORY AND RELEVANT FACTS
A. Procedural History
[¶4] Box Creek filed an action for declaratory judgment and seeking to quiet title to the mineral rights underlying real property in Converse County. Box Creek claimed the deeds did not convey the minerals underlying the railroad. In response, BNSF generally denied Box Creek's claims and argued that the mineral estate passed to BNSF's predecessor in interest.[2]
[¶5] Box Creek designated Marc Strahn as its expert witness. In his report, Strahn described his methodology in determining the intent of the parties when a deed is unclear. After looking at the deed itself, Strahn examined the surrounding title to see if those documents indicate the parties' intent. Then, Strahn asked questions concerning the circumstances surrounding the execution of the instrument including whether there was mineral activity in the area at the time of the conveyance. In this case, Strahn also examined the historical practices surrounding property conveyances used by persons in Wyoming.
[¶6] Before trial, BNSF moved to exclude the expert report and testimony. Citing this Court's familiar Bunting standard, BNSF argued that Strahn's testimony not only lacked a sufficiently reliable methodology, but also that the testimony would not be helpful to the finder of fact. Box Creek opposed the exclusion of its expert. In general, Box Creek argued that Strahn's experience as a landman researching mineral conveyances allowed him to "testify as to his observations of the language utilized in the two deeds and historical conveyancing standards." In reaching his opinions regarding the parties' intent as to the deeds at issue, Strahn reviewed the deeds and 27 documents affecting title to the minerals at issue. All 27 documents post-dated the conveyances by at least 37 years.
[¶7] The district court held a hearing on BNSF's motion to exclude Strahn's testimony. Following the hearing, the district court denied BNSF's motion finding in toto that "Mr. Strahn's report is sufficiently reliable and he is properly qualified as an expert under W.R.E. 702. Defendant is certainly free to explore Mr. Strahn's qualifications in cross examination." After denying cross motions for summary judgment, the district court conducted a bench trial. BNSF properly preserved its objection to Strahn's testimony by filing a pretrial motion in limine and objecting to the testimony at trial.
[¶8] Following a bench trial, the district court found the deeds constituted "an easement-like conveyance, rather than a fee simple *165 interest." Consequently, the district court quieted title to the minerals in Box Creek. BNSF filed a timely notice of appeal.
B. Relevant Facts
[¶9] Generally, the evidence at trial was undisputed. In large part, as explained below, the evidence consisted of testimony as to what part (or parts) of the deeds the district court should emphasize in determining the intent of the parties from two ambiguous instruments.
[¶10] This case involves two deeds drafted by BNSF. On July 10, 1913, Box Creek's predecessors in interest, the Douglas Canal Company and John Morton and S.E. Morton, executed two Right of Way Deeds in favor of Big Horn Railway Company, BNSF's predecessor in interest. The Converse County Clerk recorded the deeds on July 19, 1913 (Deeds 42338 and 42339).
[¶11] The parties titled each deed as a "Right of Way Deed." The granting clauses in each deed states that Box Creek "does hereby grant, bargain, sell and convey" an interest in the real property to BNSF. The grant is to BNSF's "successors and assigns." Then, each deed described the property conveyed.
[¶12] Both deeds granted BNSF "[a] strip of land one hundred and fifty (150) feet wide, it being seventy-five (75) feet wide on each side of the center line of the railroad of said railroad company as the same is now located."[3] These conveyances are described as going "over and across" certain lands. Box Creek also conveyed "a strip of land two hundred (200) feet wide, it being one hundred (100) feet wide on each side of the center line of the said railroad" in different sections. Again, these conveyances are described as going "over and across" certain lands. In Deed 42338, BNSF received "a strip of land" described as containing a little more than 41 acres "for station ground purposes."
[¶13] Each conveyance required the railroad to provide crossings and a means of irrigation. In Deed 42339, the "conveyance is made with the understanding that the said Railroad Company shall provide crossings across its right of way and track, and means of irrigating the land on either side of the right of way above described ...." (Emphasis added.) In Deed 42338, "the conveyance is made on condition that said Railroad Company shall provide crossings across its right of way and track, and means of irrigating the land on either side of said right of way." (Emphasis added.)
[¶14] Each deed's habendum clause grants BNSF the right "TO HAVE AND TO HOLD the land above described unto the said Railroad Company, its successors and assigns forever." The same paragraph continues that:
[a ]nd in addition to the right of way described above , it hereby grants for itself, and its successors and assigns, the right to said railroad company to erect and maintain a snow fence, where the same may be deemed necessary, for the term of four months, each and every year after the date of this instrument, at any point within one hundred feet on either or both sides of the center line of said railroad, as now located on said above described land. [ (Emphasis added.) ]
PART II
APPLICABLE LAW
A. Standard of Review
[¶15] The district court heard this case without a jury. We, therefore, apply our standard for reviewing decisions made by a district court following a bench trial:
The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed *166 evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
Mullinnix LLC v. HKB Royalty Tr. , 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo. 2006).
[¶16] Further, "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law." Mullinnix, ¶ 12, 126 P.3d at 916. The district court's conclusions of law and application of law to facts are subject to our de novo standard of review. Mullinnix, ¶ 12, 126 P.3d at 916.
B. General Wyoming Property Law
[¶17] Under Wyoming law, "every conveyance of real estate shall pass all the estate of the grantor therein, unless the intent to pass a less estate shall expressly appear or be necessarily implied in the terms of the grant." Wyo. Stat. Ann. § 34-2-101 (LexisNexis 2017). This statutory language has remained unchanged since at least 1910. See Forde v. Libby , 22 Wyo. 464, 143 P. 1190, 1191 (1914). As a result, in general, "[w]hen the surface is granted without reference to the mineral estate, it is presumed the mineral estate is included." Gilstrap v. June Eisele Warren Tr. , 2005 WY 21, ¶ 15, 106 P.3d 858, 863 (Wyo. 2005).
[¶18] However, easements are different. "An easement is an interest in land which entitles the easement holder to a limited use or enjoyment over another person's property." Thornock v. Esterholdt , 2013 WY 42, ¶ 20, 299 P.3d 68, 74 (Wyo. 2013) (internal quotation marks and citations omitted) (emphasis added). Thus, by its own terms, an easement is a limited grant. Consequently, an easement "necessarily implies" that the grantor is conveying less than the whole. See Town of Moorcroft v. Lang , 779 P.2d 1180, 1184 (Wyo. 1989) (grant of fee simple determinable necessarily means that grantor conveyed less than the whole).
C. Interpretation of Terms of the Deeds
[¶19] "[T]he ultimate goal of our interpretation of any contract, including a deed, is to discern the intention of the parties to the document." Mullinnix LLC , ¶ 22, 126 P.3d at 919. The Court ascertains the parties' intent "by considering all the provisions of the deed, as well as the situation of the parties." Balch v. Arnold , 9 Wyo. 17, 59 P. 434, 436 (1899) ; see also Mullinnix LLC , ¶ 23, 126 P.3d at 919. When interpreting a deed, courts begin by looking at the deed itself and the "specific language of the deed." Gilstrap , ¶ 12, 106 P.3d at 862 (internal quotation marks and citations omitted). "[D]ocuments executed as part of the same transaction should be considered together and consistently." Davidson Land Co., LLC v. Davidson , 2011 WY 29, ¶ 14, 247 P.3d 67, 72 (Wyo. 2011).
[¶20] When examining the words used in a deed, this Court gives those words "their plain and ordinary meaning. Plain meaning is that meaning which the language would convey to reasonable persons at the time and place of its use." Gilstrap , ¶ 12, 106 P.3d at 862 (internal quotation marks omitted). Giving meaning to terms, like "right of way," when used in deeds over a century old requires the Court to look at what those terms meant at the turn of the 20th century, not necessarily what those terms mean at the turn of 21st century. See Powers v. State , 2014 WY 15, ¶ 36, 318 P.3d 300, 313 (Wyo. 2014).
[¶21] In construing deeds affecting mineral interests, this Court must "focus on the general intent of the parties, concentrating on the purpose of the grant in terms of the respective manner of enjoyment of surface and mineral estates and the exploitation of the mineral resources involved." Caballo Coal Co. v. Fid. Expl. & Prod. Co. , 2004 WY 6, ¶ 11, 84 P.3d 311, 315 (Wyo. 2004). The Court does this by giving words their "plain and ordinary meaning to reasonable persons at the same time and place of their use" by applying "a historical context analysis." Id.
*167 [¶22] Courts may consider extrinsic evidence (aside from the facts surrounding the transaction) "when the terms are ambiguous or are used in some special or technical sense not apparent from the contractual document itself." Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC , 2008 WY 101, ¶ 16, 191 P.3d 125, 131 (Wyo. 2008) (internal quotation marks and citation omitted). "An ambiguous contract is one which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present." Wadi Petroleum, Inc. v. Ultra Res., Inc. , 2003 WY 41, ¶ 12, 65 P.3d 703, 708 (Wyo. 2003) (internal quotation marks and citation omitted). Although the title of a document may not contradict an otherwise unambiguous deed, the title is relevant when the terms of the deed are ambiguous. In that instance, the title of a document "provide[s] additional evidence of intent" of the parties. Clark v. CSX Transp., Inc., 737 N.E.2d 752, 758 (Ind. Ct. App. 2000). An ambiguous deed is construed against the drafter. See Collins v. Finnell , 2001 WY 74, ¶ 19, 29 P.3d 93, 100 (Wyo. 2001).
D. Admission of Expert Testimony
[¶23] This Court gives substantial deference to trial courts in determining what expert testimony should and should not be considered. Goebel v. Denver & Rio Grande W. R.R. Co. , 215 F.3d 1083, 1087 (10th Cir. 2000) ( Goebel I ); accord Easum v. Miller , 2004 WY 73, ¶ 21, 92 P.3d 794, 800 (Wyo. 2004) ; Bunting v. Jamieson , 984 P.2d 467, 470 (Wyo. 1999) (quoting Campbell v. Studer , Inc. , 970 P.2d 389, 392 (Wyo. 1998).) Even if the district court is found to have abused its discretion, reversal is necessary only where the effect was prejudicial and that prejudice affected a substantial right. Smyth v. Kaufman, 2003 WY 52, ¶ 29, 67 P.3d 1161, 1169-1170 (Wyo. 2003).
[¶24] "While the district court has discretion in the manner in which it conducts its Daubert analysis, there is no discretion regarding the actual performance of the gatekeeper function." Goebel I , 215 F.3d at 1087 (emphasis in original); see also Kumho Tire Co., Ltd. v. Carmichael , 526 U.S. 137, 158-59, 119 S.Ct. 1167, 1179, 143 L.Ed.2d 238 (1999) (Scalia, J., concurring) (the majority opinion "makes clear that the discretion it endorses-trial-court discretion in choosing the manner of testing expert reliability-is not discretion to abandon the gatekeeping function").
[¶25] Consequently, "[w]e review de novo the question whether the district court performed its gatekeeper role and applied the proper legal standard in admitting or excluding an expert's testimony." Easum , ¶ 21, 92 P.3d at 800. See Dodge v. Cotter Corp. , 328 F.3d 1212, 1223 (10th Cir. 2003).
[¶26] Like the Federal courts, we now recognize "that the district court need not recite the Daubert standard as though it were some magical incantation, or apply all of the reliability factors suggested in Daubert and Kumho . The gatekeeper inquiry under Rule 702 is ultimately a flexible determination." Goebel , 215 F.3d at 1088 (internal quotation marks and citation omitted). Still, "the [trial] court must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." Gopalratnam v. Hewlett-Packard Co. , 877 F.3d 771, 782 (7th Cir. 2017).
PART III
DISCUSSION
[¶27] Grants to railroads in the late-19th and early-20th centuries are no stranger to litigation. Courts from at least 37 states, as well as numerous Federal courts (including nine circuit courts and the United States Supreme Court) have opined on whether deeds to a railroad conveyed fee simple title or just an easement. See A. E. Korpela, Annotation, Deed to Railroad Company as Conveying Fee or Easement , 6 A.L.R.3d 973 (originally published in 1966). These courts have identified various factors to consider when determining the nature of the conveyance. See Brown v. State , 130 Wash.2d 430, 924 P.2d 908, 912 (1996). Unfortunately, all that can be said of the state of the law regarding railroad deeds is that "[t]he decisions dealing with conveyancing of rights of way to railroads in various jurisdictions are *168 in considerable disarray[.]" Ray v. King Cty. , 120 Wash.App. 564, 86 P.3d 183, 187 (2004) (internal quotation marks omitted).
[¶28] BNSF asks that we only look to the granting and habendum clauses in determining the meaning of the deeds. That approach is inconsistent with the statutory law and our precedent, which requires we give meaning to all terms of the deed. Moreover, such an approach highlights the ambiguity of these deeds insofar as the granting clause conveys "real estate" and the habendum clause refers to the grant as a "right of way."[4]
[¶29] For the reasons set forth below, we agree with the district court that these deeds are ambiguous. We further conclude that the ambiguity in this case leads to the conclusion that the deeds granted easements. Since the deeds evidence that Box Creek did not intend to convey the whole of its estate, the presumption that the mineral estate passed to BNSF is rebutted, and therefore, the district court properly quieted title to the minerals in Box Creek.
A. Ambiguous Deeds
[¶30] As noted above, the granting clauses in each deed appear to grant a fee simple. However, the deeds are titled "Right[s] of Way." The deeds do not expressly convey all right, title, and interest. Instead, part of the grant in Deed 48338 specifically limits BNSF's use of some of the land "for station ground purposes." Then, the habendum clauses not only refer to the grant as being a "right of way," but also grant the railroad the right to use its own land, and some additional land owned by Box Creek, for a snow fence. The grants for a station ground and the snow fence grant only allow BNSF to use Box Creek's land for very specific purposes, thereby indicating that Box Creek was conveying less than its whole interest.[5]
[¶31] Additionally, both deeds convey a "strip of land" without any limitation. However, the deeds only confer strips of land "over and across" other lands. Some of the "strip of land" grants identify the overall acreage included and some do not. Neither deed contains the word "easement," but instead use the term "right of way." In light of these inconsistent terms, we agree with the district court's conclusion that these deeds are ambiguous.
B. Rights of Way
[¶32] Whatever else can be said about the deeds, it is clear that the deeds intended to convey a "right of way" since both deeds refer to the "right of way described above" in the habendum clause and are entitled "Right of Way" deeds. As this Court noted in Thornock , although all easements are rights of way, not all rights of way are easements. Thornock, ¶ 20, 299 P.3d at 74. That being said, we must look at what "right of way" meant when the parties executed this deed in Converse County, Wyoming in 1913.
[¶33] In 2014, Black's Law Dictionary defined "right of way" as "the right to pass through property owned by another." Black's Law Dictionary at 1522 (10th ed. 2014). Thus, today, a "right of way" means a right to pass over (i.e., over and across) another's land and only refers to an estate in land when describing the track bed. In 1913, a "right of way" constituted:
The right of passage or of way is a servitude imposed by law or by convention, and by virtue of which one has a right to pass on foot, or horseback, or in a vehicle, to drive beasts of burden or carts, through *169 the estate of another. ... "Right of way" in its strict meaning is the right of passage over another man's ground and in its legal and generally accepted meaning, in reference to a railway , it is a mere easement in the lands of others, obtained by lawful condemnation to public use or by purchase. It would be using the term in an unusual sense by applying it to an absolute purchase of the fee-simple of lands to be used for a railway or any other kind of way.
Black's Law Dictionary at 1040 (2d ed. 1910) (emphasis added).
[¶34] Based upon the definition of "right of way" in 1910, it would have been "unusual" for someone drafting a deed in 1913 to believe the grant of a "right of way" meant a fee-simple conveyance of the whole. Instead, the drafter would have considered a conveyance of a right of way to grant only an easement.
[¶35] BNSF obtained its "right of way" for its rail-bed through the Act of March 3, 1875.[6] Consistent with the definition of "right of way" in 1913, the United States Supreme Court concluded that the "right of way" granted to railroad companies by the Act of March 3, 1875 "clearly grants only an easement, and not a fee." Great N. R. Co. v. United States , 315 U.S. 262, 271, 62 S.Ct. 529, 532, 86 L.Ed 836 (1942). Again, it would be unusual for BNSF to acquire a "right of way" from the United States, which the Supreme Court held only constituted an "easement," but then acquire a "right of way" from Box Creek and have it constitute a fee simple conveyance of the whole of what Box Creek possessed.
[¶36] Additionally, the grant of the right to erect a snow fence would, at least in part, be superfluous, if we construed the deeds as conveying fee simple title to all the lands described. In each deed, the grantors granted "a strip of land two hundred (200) feet wide," 100 feet on either side of the center line of the railroad. Other places in the deeds, the grant is only 150 feet wide, 75 feet on either side of the railroad. Yet, the deeds also convey for BNSF "the right ... to erect and maintain a snow fence ... at any point within 100 feet on either or both sides of the center line of said railroad."
[¶37] BNSF argues that the granting of the right to build snow fences "up to 100 feet from the railroad's centerline ... grants the railroad an additional right to erect snow fences on lands outside of and adjacent to the Subject Lands." In essence, the snow fence right of way gives BNSF an additional 25 feet on either side of the railroad track to construct its snow fence. Moreover, argues BNSF, the use of the word "right" to erect a snow fence shows the parties knew how to grant a limited conveyance.
[¶38] However, this argument ignores an obvious question: if Box Creek conveyed a 200-foot fee simple estate to a "strip of land" on page one of the deed, as argued by BNSF, why would the parties place a restriction on the same 200-foot strip of land on page two of the same instrument? If the parties intended a fee simple grant of the entire 200-foot strip, then the "right" to construct a snow fence on the additional 25 feet should only have applied to the 150-foot "strip of land." To give meaning to all terms of the deed, construing the snow fence grant as an easement and the 200-foot strip of land grant as an easement, makes the entire deed consistent insofar as the deed does not convey a fee simple and then restrict part of that fee simple grant by putting a condition on it. It merely grants an additional 25-foot easement where the original easement was only 75 feet.
[¶39] Moreover, it would be unreasonable to believe that, in a single instrument, the parties intended both a fee simple grant and an easement. That is, it would be unreasonable to conclude that the "strip of land" grants were intended to be fee simple absolute grants, but that the grant "for station ground purposes" was intended as an easement *170 since it is a limited grant. See Swan v. O'Leary , 37 Wash.2d 533, 225 P.2d 199, 200-01 (1950) ("It seems inconceivable that the parties, having in mind the use of the strips of land for the same purpose, would convey a fee simple title to one, but in the case of the other a right of way only.").
[¶40] To be sure, the deeds at issue are less than pellucid. Construing the deeds against the drafter (BNSF) in their historical context, and giving "right of way" its plain meaning as understood in 1913, the deeds at issue conveyed only a limited grant. Under Wyo. Stat. Ann. § 34-2-101, the terms of the grants themselves necessarily imply that Box Creek conveyed less than its whole. The deeds, read in their entirety, indicate Box Creek conveyed a right of way, which meant an easement in 1913. Consequently, we affirm the district court's judgment for the foregoing reasons.
C. Admission of Expert Testimony
[¶41] After BNSF filed its motion in limine regarding Strahn's testimony, the district court exercised its discretion by conducting a Daubert hearing. See Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The district court did not err in conducting an argument-only hearing to allow it to perform its gatekeeping role. The district courts maintain substantial discretion on how to evaluate the reliability of expert testimony and substantial discretion as to the manner they evaluate reliability. However, there must be some analysis for this Court to review to determine that the trial court did conduct some sort of "gatekeeping" function under Daubert / Bunting .
[¶42] Here, the district court made no specific findings regarding reliability. As noted above, the district court's entire analysis of the reliability of Strahn's methodology consists of stating that "Mr. Strahn's report is sufficiently reliable and he is properly qualified as an expert under W.R.E. 702." Without some explanation of how the trial court reached its conclusion, this Court cannot effectively review the district court's decision to admit expert testimony.
[¶43] In this case, the need for some specific findings as to reliability of Strahn's methodology is apparent from the trial. Before trial, Strahn opined:
In this time period [1900-1913], and really before the 30's and 40's, minerals were usually conveyed by direct conveyance such as a Mineral Deed or a Mineral Quit Claim Deed. The practice of specifying minerals by reservation in a Warranty Deed came more into play in the 1930's and 1940's when greater development for oil and gas started in the Powder River Basin as supported in the public record.
(Emphasis added.)
[¶44] At trial, Strahn restated this opinion. Strahn explained his conclusion was generally based on his training and experience as a landman. On cross examination, Strahn explained his methodology for the above opinion:
Q: You can't really specifically cite the source of the information you relied on to reach this conclusion, can you?
A: I cannot.
* * *
Q: ... Do you know how many conveyances of minerals were done by grant versus reservation in Converse County, Wyoming, in this time period?
A: I have no idea.
Q: You can't really say with any degree of empirical certainty that minerals were transferred more often by conveyance than reservation in this time period, can you?
A: I cannot.
Q: So is it fair to say it's more of just a gut feeling, that based on your experience you feel like you've seen more deeds from the time period conveying minerals than reserving them?
A: Yeah. It's the history from the work that I've done ... from when I've seen those particular types of transactions made.
[¶45] This testimony demonstrates that Strahn's assertion regarding historical practices is based upon a "gut feeling." "Gut feelings" or "common knowledge" are exactly *171 what the gatekeeper role is designed to prevent. The gatekeeper must make sure that the method used by the expert is reliable. Bunting , 984 P.2d at 471 ("primary goal of Daubert's gatekeeping requirement 'is to ensure the reliability and relevancy of expert testimony' "). Without any explanation from the district court as to the factors it considered in finding Strahn's assertions "sufficiently reliable," this Court is unable to determine if something other than Strahn's "gut feeling" formed the basis for his opinion. If it was just his "gut feeling" based upon no particular methodology, then the district court should have excluded his testimony.
[¶46] When there are no findings, even as to what factors the district court used in making its reliability determination, the district court commits error insofar as it has abandoned its role as gatekeeper. When it comes to establishing that the trial court conducted its gatekeeping role, the trial court need not follow any formulaic recitation or recite all the Daubert factors. Instead, the district court need only make specific findings sufficient to allow this Court, and the parties below, to confirm that Daubert / Bunting - type factors were applied in reaching the reliability determination. To be clear, how the district courts apply and weigh any Daubert / Bunting -type factors the trial court identifies remains in the sound discretion of the district court.
[¶47] Normally, our decision would require us to remand this case for the district court to explain that it properly exercised its role as a gatekeeper as to Strahn's testimony. However, under our harmless error analysis, we only need to reverse the district court if we find the district court error prejudicial to BNSF's substantive rights. To do so, we must find that there is "a reasonable probability that, in the absence of the error, the verdict might have been different." Smyth , ¶ 29, 67 P.3d at 1169-70.
[¶48] The district court referenced Strahn's opinion that "conveyances to railroads were usually done through a surface-related document: an easement or right of way, and they did not usually include the minerals." Likewise, the district court specifically referenced Strahn's observation "that minerals were usually conveyed directly by a mineral or warranty deed in the early 1900's." The district court found Strahn's testimony "persuasive."
[¶49] Still, even without Strahn's testimony as to historical practices, this Court concludes that the district court could have found as it did, namely that Box Creek proved that the right-of-way deeds intended to convey only a limited interest under Wyo. Stat. Ann. § 34-2-101. Without Strahn's opinions, the district court construed the conflicting language of the right-of-way deeds and determined that Box Creek did not intend to convey its whole interest, but instead, conveyed an easement, albeit arguably in fee simple, which is what a right of way meant in 1913. The district court considered the deeds within their historical contexts, the parties position and relation to one another (Box Creek were ranchers and BNSF was a railroad whose main business was not minerals), and the use of the words "over and across" and "right of way" to determine the parties' intent. Therefore, we conclude that the admission of Strahn's testimony by the district court without conducting its gatekeeping function constituted a harmless error under the facts of this case.
CONCLUSION
[¶50] Since at least 1899, Wyoming law has stated that if you do not explicitly, or implicitly , retain one of your sticks, then you are presumed to have conveyed your whole bundle. Reading the deeds in their entirety, the district court correctly found that Box Creek did not intend to convey the whole of its interest, but instead only intended to convey a part of its interest, namely a right of way, which in 1913 was synonymous with an easement. Under the facts of this case, the district court correctly concluded that the parties intended a limited grant from Box Creek to BNSF, which in the district court's words amounted to an "easement-like conveyance."
[¶51] Regardless of what it is called, Box Creek expressed an intent to convey less than the whole of its interests in the lands described in the deeds. Since there is no mention of any conveyance of the mineral *172 rights, the district court correctly quieted title to those rights in Box Creek. Therefore, the judgment of the district court is AFFIRMED.

Box Creek amended its complaint on September 22, 2016 and again on April 7, 2017. There are no substantive differences in the complaints that affect the issues presented to the district court or this Court.

There is no dispute as to either party's chain of title. The dispute is over what the original deeds actually conveyed (or did not convey). Therefore, to avoid confusion, the Court will refer to the grantors under the deeds as "Box Creek" and the grantees under the deeds as "BNSF."

Although not entirely clear, it appears the railroad was built by the time the deeds were executed. According to the testimony of BNSF's representative, a 1914 map contains the as-built location of the railroad. The parties executed the deed in mid-1913. Additionally, each deed refers to the center line of the railroad "as the same is now located." (Emphasis added.)

"[T]he term 'right of way' has a two-fold signification. It sometimes is used to describe a right belonging to a party, a right of passage over any tract; and it is also used to describe that strip of land which railroad companies take upon which to construct their road-bed." Joy v. City of St. Louis , 138 U.S. 1, 44, 11 S.Ct. 243, 256, 34 L.Ed. 843 (1891). The latter definition cannot apply because the railroad already existed. It would be unreasonable to construe "right of way" in these deeds as constituting the "land" on which the railroad company was going "to construct their road-bed" when the roadbed was already built on other lands.

BNSF argues that the deeds fail as easements because they do not identify a dominant and servient estate. However, the dominant estate is identified as the railroad corridor and the servient estate is the realty from which the easements were exacted.

At trial, BNSF's representative testified that one of the deeds stated $3,000.00 as the consideration and that he "did the math on this one" and concluded the consideration was $418.00 per acre. However, that deed (Deed 48338) included 41.68 acres for station ground purposes. If that were the only conveyance in the deed, the price would be $71.97 per acre. However, that same deed also conveys the right to use a 150-foot strip of land and a 200-foot strip of land, the area of which is unknown.