# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 92

**APRIL TERM, A.D. 2025**

**August 13, 2025**

BRUCE H. CLARK and ELAINE
SULLIVAN, Trustees of the Lenore H.
Clark Living Trust dated September 24,
1992,

Appellants
(Plaintiffs),

v.

S-24-0319

BRYCE E. FULLER and ALISHA M.
FULLER,

Appellees
(Defendants).

*Appeal from the District Court of Lincoln County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellants:*
James K. Sanderson and Johnathan R. Gordon, Sanderson Law Office, Afton, Wyoming. Argument by Mr. Sanderson.

*Representing Appellees:*
Edward S. Bushnell, Bushnell Law Office, LLC, Jackson, Wyoming. Argument by Mr. Bushnell.

*Before BOOMGAARDEN, C.J., and FOX,\* GRAY, FENN, and JAROSH, JJ.*

\* Justice Fox retired from judicial office effective May 27, 2025, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2025), she was reassigned to act on this matter on May 28, 2025.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Bruce H. Clark and Elaine Sullivan, Trustees of the Lenore H. Clark Living Trust (the Clarks), sued Bryce and Alisha Fuller, alleging an express easement or, in the alternative, an implied easement over the Fullers' property. Following a bench trial, the district court found no easement, express or implied. The Clarks timely appealed. We affirm.

### ISSUES

[¶2]        1.    Did the district court clearly err when it concluded there was no express easement?

            2.    Did the district court clearly err when it concluded there was no implied easement?

### FACTS

[¶3]    Lenore Clark owned a quarter section of land in Lincoln County, Wyoming. The Clark family used the land for agricultural purposes. In 2003, Mrs. Clark recorded a plat designating a portion of the land as the Sunrise Subdivision. In 2005, Mrs. Clark recorded the "Declaration of Covenants, Conditions and Restrictions of Sunrise Subdivision" (CC&Rs).

[¶4]    The subdivision consists of four lots, numbered 1 to 4, arranged sequentially from north to south. Lot 1 is at the northernmost end, sharing its southern boundary with Lot 2. Lot 2 adjoins Lot 3 to the south, and Lot 3 adjoins Lot 4 to the south. Each lot spans the full width of the subdivision west to east.

[¶5]    The plat depicts an access road from County Road 126 labeled Buttercup Lane. According to the plat, Buttercup Lane starts at the north end of the subdivision and terminates at its south end. It runs along the east edge of the subdivision through Lots 1, 2, 3, and 4. The plat shows a dotted circle on Buttercup Lane where it crosses Lot 3 into Lot 4, labeled "temporary cul-de-sac."

[¶6]    Land to the east of the subdivision is owned by third parties and, at the time the plat was filed, Mrs. Clark owned the land to the south and west of the subdivision. Important to the parties' dispute is the land south of the subdivision, which we will refer to as the southern property. The subdivision was fenced on its south, west, and east borders. A gate in the south fence aligned with Buttercup Lane and provided access to the southern property. The plat's map of the subdivision follows.

1



Lot 1

Lot 2

Buttercup Lane
(60' Access Easement)

Lot 3

60' temporary cul-de-sac

Lot 4

Fence

South half of northwest quarter ≈73 acres total,
owned by Lenore H. Clark Living Trust and
other individual Clark family members
(The South Property)

N

[¶7]    Mrs. Clark eventually sold all four subdivision lots.  After a series of other owners, Bryce and Alisha Fuller purchased Lot 4 in February 2021.  The Fullers' title insurance policy lists "Special Exceptions" from coverage, including "All matters delineated on the Official Plat of Sunrise Subdivision" and "Terms, provisions, covenants, conditions, restrictions and easements, provided in the Covenants, Conditions and Restrictions."

[¶8]    Mrs. Clark died in March 2021, and the southern property was transferred to the Lenore H. Clark Living Trust.  After the Fullers denied the Clarks and members of their family access to the southern property through Lot 4, the Clarks filed this lawsuit asserting an express or implied easement through Lot 4.  Following a bench trial, the district court held no express easement existed through Lot 4 and the Clarks did not establish an implied easement.  The Clarks timely appealed.

*STANDARD OF REVIEW*

[¶9]   The Clarks argue the district court erred when it found no express or implied easement existed through Lot 4.  Our standard of review following a bench trial is well-established.  We review findings of fact for clear error and conclusions of law de novo:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict.  While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record.  Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence.  Findings of fact will not be set aside unless they are clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.  We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.  The district court's conclusions of law are reviewed de novo.

*Leeks Canyon Ranch, LLC v. Jackson Hole Hereford Ranch, LLC*, 2025 WY 63, ¶ 31, 569 P.3d 1120, 1130 (Wyo. 2025) (quoting *Boot Ranch, LLC v. Wagonhound Land & Livestock Co., LLC*, 2024 WY 136, ¶ 23, 560 P.3d 887, 893 (Wyo. 2024)); *see also Tilden v. Jackson*, 2025 WY 57, ¶ 18, 568 P.3d 1197, 1203–04 (Wyo. 2025).

## *DISCUSSION*

### I.    *Did the district court clearly err when it concluded there was no express easement?*

[¶10]  "An easement is a nonpossessory interest in land that entitles the easement holder to a right of limited use in another's property." *Testolin v. Thirty-One Bar Ranch Co.*, 2024 WY 6, ¶ 16, 541 P.3d 455, 460 (Wyo. 2024) (quoting *Upper Wagon Box, LLC v. Box Hanging Three Ranch Ltd. P'ship*, 2022 WY 155, ¶ 11, 521 P.3d 551, 558 (Wyo. 2022) (citing *BNSF Ry. Co. v. Box Creek Min. Ltd. P'ship*, 2018 WY 67, ¶ 18, 420 P.3d 161, 166 (Wyo. 2018))).  When we interpret easements, we apply the rules that govern contract interpretation. *Id.*

> [W]e seek to determine the intent of the parties to the easement and begin by attempting to glean the meaning of the easement from its language. If the language of the easement is clear and unambiguous, we interpret the easement as a matter of law, without resorting to the use of extrinsic evidence to determine the parties' intent. If, however, the language is ambiguous, then the court looks to extrinsic evidence to ascertain the parties' intent.

*Gayhart, Tr. of the Tiphany L. Gayhart Living Tr. dated October 1, 2008 v. Corsi*, 2020 WY 58, ¶ 15, 462 P.3d 904, 909 (Wyo. 2020) (cleaned up) (quoting *Pokorny v. Salas*, 2003 WY 159, ¶ 23, 81 P.3d 171, 177–78 (Wyo. 2003)).

. . .

We have also said:

> The language of a contract is to be construed within the context in which it was written. In so doing, the court may look to the surrounding circumstances, the subject matter and the purpose of the contract. The purpose of examining the context within which the contract was drawn, however, is limited to ascertaining the intent of the parties at the time the agreement was made. The context cannot be invoked to contradict the clear meaning of the language used, and those extraneous circumstances do not justify a court in proceeding to insert therein a provision other than or different from that which the language used clearly indicates, and thereby, in effect, make a contract for the parties.

*Upper Wagon Box*, 2022 WY 155, ¶ 23, 521 P.3d at 560 [(emphasis removed)] (quoting *Lozier v. Blattland Invs., LLC*, 2004 WY 132, ¶ 9, 100 P.3d 380, 383–84 (Wyo. 2004)).

*Testolin*, ¶¶ 16–17, 541 P.3d at 461.

[¶11] The Clarks rely on the Certificate of Owners affixed to the subdivision plat to support their claim for an express easement. It states, in relevant part,

Buttercup Lane as shown on this plat is a private road with non-exclusive right-of-way granted to Lot 1, Lot 2, Lot 3 and Lot 4;

.   .   .

the undersigned owners[1] reserve the right of ingress, egress, and utilities over, under, and across said Buttercup Lane and **reserve the right to extend said Buttercup Lane to the South property boundary of said Sunrise Subdivision for access to adjoining lands**. **Should such easement be exercised by said undersigned owners in the future, the owners or potential buyers of Lot 4 will be notified of said undersigned owners' decision to exercise said right** reserved unto themselves;

. . . the subdivision is subject to easements of record;

.   .   .

the temporary cul-de-sac will be eliminated when Buttercup Lane is extended and . . . the land reverts back to the owners of Lot 3 and Lot 4.

[¶12]   The parties do not dispute that Buttercup Lane provided access to Lots 1 through 4 or that an easement exists giving the right of ingress, egress, and utilities from the northern boundary along the eastern border of the subdivision to the "temporary cul-de-sac."  The question is whether the access easement extends across Lot 4 to the southern boundary of the subdivision.

[¶13]  Under the Certificate of Owners, Mrs. Clark "reserve[d] the right" to extend Buttercup Lane to the southern boundary of the subdivision and specified that if she wanted to exercise that right "in the future," she would notify the owners or potential buyers of Lot 4.   Accordingly, whether there is an express easement to the subdivision's southern boundary depends on whether Mrs. Clark provided notice to the owners of Lot 4 of her decision to extend Buttercup Lane.  The Clarks contend the plat and the CC&Rs provided constructive notice of Mrs. Clark's extension of Buttercup Lane to past, present, and future owners of Lot 4.[2]

---

[1] There is a single undersigned owner designated on the Certificate of Owners—Mrs. Clark.

[2] In their brief, the Clarks also contend that actual notice was provided to the first purchaser of Lot 4, Mr. Sanderson.  At trial, Neil Clark testified that Mr. Sanderson was given oral notice of the extension of the

5

[¶14]   The plat, by its clear and unequivocal terms, required Mrs. Clark to provide notice to the owners of Lot 4 if she wanted to exercise her reserved right to extend Buttercup Lane.  The plat only addresses Mrs. Clark's reserved right, which was contingent on future notice of its exercise.  It is not, and cannot be, notice of the actual exercise of that right.

[¶15]   The CC&Rs were recorded two years after the plat.  They provide:

> ACCESS ROAD.  A private road named Buttercup Lane provides access for ingress and egress and all utilities from the Lincoln County Road No. 12-126 to the property.  Each lot in the property shall have an easement for such use of that road. **The same private road also provides such access to other surrounding lands**.  **Each property owner shall be responsible for a reasonable and fair share of the maintenance expense of that road, including winter snow removal, based upon the use made of the road for access to each lot in the property and to the other lands for which the road is used for access.**
> No vehicles may be parked on any portion of the roadway at any time.

(Emphasis added.)

[¶16]   While the CC&Rs clearly grant "[e]ach lot" an easement to use Buttercup Lane for ingress, egress, and utilities, they do not state that Mrs. Clark is exercising her reserved right to extend the easement to other lands.  The CC&Rs' statement that Buttercup Lane "provides such access to other surrounding lands" is ambiguous, as "other surrounding lands" is undefined and could refer to the southern property or other adjacent lands.  Likewise, "such access" lacks clarity on whether it includes ingress, egress, utilities, or other uses, and whether it benefits only Lot 1–4 owners, Mrs. Clark, or both.  The terms "property" and "property owner" appear to refer only to subdivision lot owners, with no maintenance responsibility assigned to owners of other lands, further obscuring the easement's scope and beneficiaries.  The CC&Rs are ambiguous.

---

easement.  The Clarks provide no argument regarding this contention, and we decline to address it here. *Sorum v. Sikorski*, 2024 WY 124, ¶ 2, 559 P.3d 153, 157 (Wyo. 2024) (issues not supported by cogent argument on appeal will not be addressed).  *See also* Wyo. Stat. Ann. § 1-23-105 (agreements conveying real property must be in writing); *Jenkins v. Miller*, 2008 WY 45, ¶ 13, 180 P.3d 925, 930 (Wyo. 2008) (easements are subject to the statute of frauds); *Bentley v. Dir. of Off. of State Lands & Invs.*, 2007 WY 94, ¶¶ 40–41, 160 P.3d 1109, 1120 (Wyo. 2007) (to provide notice to subsequent purchasers, easement must be recorded).

6

[¶17] Because we find the CC&Rs to be ambiguous, we turn to extrinsic evidence to ascertain whether Mrs. Clark provided notice and thereby extended the easement. Evidence introduced at trial included:

- The CC&Rs provide that each property owner is responsible for his/her share, based on road usage, of the expenses incurred for maintaining Buttercup Lane. The Clarks never contributed money or labor to maintain Buttercup Lane.

- The only evidence of written notice to any "owner or potential buyer of Lot 4" (as specified in the plat) was the CC&Rs.

- The temporary cul-de-sac has not been eliminated.

- The Clarks never filed an amended plat and never applied to Lincoln County to eliminate the cul-de-sac or extend Buttercup Lane.

- Members of the Clark family very rarely accessed the southern property through Lot 4. Neil Clark and Nord Clark testified that they would drive a four-wheeler or pickup through Lot 4 to access the southern property once or twice a year. Neil Clark testified that the last time he used Buttercup Lane to access the southern property was in 2021.

- Neil Clark testified that there was a two-track trail on the alleged easement, and Nord Clark testified that the track was not well-established. The district court found "[e]vidence of Google images from 2006 to 2022 detect no tracks" over the alleged easement across Lot 4.

- Ty Bazil, the second owner of Lot 4, testified that he thought Buttercup Lane "went all the way through Lot 4." Shane Robinson, the owner of Lot 2, testified that he was not aware that Buttercup Lane extended to the southern boundary of the subdivision and he has never seen members of the Clark family use Buttercup Lane to access the southern property.

- A large pile of rocks blocks nearly half the claimed easement at the southern border of the subdivision. Three irrigation risers are located within the claimed easement, also obstructing access. Neil Clark testified that the rocks and irrigation risers have been there since before the subdivision was platted. The Clarks drive around the risers and the rock pile when they access the southern property through Lot 4.

This evidence does not support the Clarks' contention that notice was provided. The CC&Rs do not satisfy Mrs. Clark's obligation to provide notice to the owners of Lot 4 of the exercise of her right to extend the easement and, as a result, are insufficient to extend

the easement. The district court did not clearly err when it concluded Mrs. Clark did not create an express easement to access the southern property through Lot 4.

## II. Did the district court clearly err when it concluded there was no implied easement?

[¶18] At trial, the Clarks argued in the alternative that there was an implied easement to access the southern property through Lot 4 of the subdivision. To establish an implied easement, the Clarks were required to demonstrate:

> (1) common ownership followed by a conveyance separating the unified ownership; (2) before severance, the common owner used part of the property for the benefit of the other part, a use that was apparent, obvious, and continuous; and (3) the claimed easement is necessary and beneficial to the enjoyment of the parcel previously benefitted.

*Tilden*, ¶ 17, 568 P.3d at 1203 (quoting *Wheeldon v. ELK Feed Grounds House, LLC*, 2021 WY 71, ¶ 12, 488 P.3d 916, 919 (Wyo. 2021)). The district court held that the Clarks did not meet their burden because they did not establish the third requirement—the claimed easement was necessary and beneficial to the enjoyment of the southern property. The Clarks contend that the district court clearly erred in reaching its conclusion.

[¶19] We have explained for an easement to be "necessary and beneficial to the enjoyment of the parcel previously benefitted," the easement

> must be necessary and beneficial to the continuing use of the Subject Property . . . . There is "no precise definition of necessity[.]" [*Miner v. Jesse & Grace, LLC*, 2014 WY 17, ¶ 49, 317 P.3d 1124, 1140 (Wyo. 2014)] (quoting *In re Estate of Shirran*, 987 P.2d 140, 145 (Wyo. 1999)). Instead, we look to the nature of the prior use to determine if there exists a necessity to establish an implied easement. *Id.* (quoting *In re Estate of Shirran*, 987 P.2d at 145). To establish an implied easement, there must "be no other reasonable mode of enjoying the dominant tenement [or the Subject Property] without the easement." 25 Am. Jur. 2d *Easements and Licenses* § 27. "Where the use of a way is a mere convenience, it is insufficient to justify the granting of an implied easement across the servient estate[.]" 28A C.J.S. *Easements* § 95. **Implied easements should only be recognized in those situations where it is clear the dominant property retains an easement over the purchaser's land, such as in situations**

8

> **where the easement is strictly necessary to the use and enjoyment of the dominant estate.** 28A C.J.S. *Easements* § 80.

*Tilden*, ¶ 22, 568 P.3d at 1205 (emphasis added). We have also said, "[i]f land can be used without an easement, but cannot be used without disproportionate effort and expense, an easement may still be implied . . . on the basis of necessity." *Miner v. Jesse & Grace, LLC*, 2014 WY 17, ¶ 49, 317 P.3d 1124, 1140 (Wyo. 2014) (quoting *In re Est. of Shirran*, 987 P.2d 140, 145 (Wyo. 1999)). Necessity is determined from the circumstances existing at the time of severance.[3] *Tilden*, ¶ 20, 568 P.3d at 1204; *Wheeldon*, ¶ 15, 488 P.3d at 921.

[¶20] The evidence introduced at trial demonstrates that from the time of severance through the trial, there was alternate access to the southern property. The west border of the southern property abuts Lincoln County Road 12-123. Access is and was available from that road. Neil Clark testified that it would be feasible to access the southern property from the north, through property he now owns. Robert Brandt Clark testified that the southern property can be accessed through adjoining land owned by the Trust and its beneficiaries, or by the county road to the west. It is undisputed that Butterfield Lane is not the only available access to the southern property.

[¶21] The Clarks contend that an easement is necessary because Buttercup Lane is "less intrusive on the surrounding land" than an alternative access road would be. We have held that inconvenience may not establish necessity. In *Tilden*, ¶ 23, 568 P.3d at 1205, a county road gave Mr. Tilden access to his property but did not provide access to the portion of his property where he desired to build a cabin. Because Mr. Tilden had not considered building that cabin until 10 years after severance, there were other places he could build his cabin, and he could access his land, we held that he did not establish the necessity required to establish an implied easement. *Id.* In *O'Hare v. Hulme*, 2020 WY 31, ¶ 34, 458 P.3d 1225, 1238 (Wyo. 2020), an alley provided alternate access to Mr. Hulme's garage but was inconvenient. We concluded that the inconvenience of manipulating vehicles through the shorter garage entrance off the alley did "not deprive Mr. Hulme of the use of his property or require him to endure disproportionate effort or expense." *Id.*

[¶22] Here, at least two alternate routes existed at the time of severance—Lincoln County Road 12-123, which borders the southern property, and other property owned by Mrs. Clark at the time of severance. Some of Mrs. Clark's property is currently owned by Neil Clark. Neil Clark testified that he did not intend to grant an easement across his property. This testimony is not relevant to our analysis because, as we pointed out above, necessity is determined at the time of severance. *Tilden*, ¶ 20, 568 P.3d at 1204. At the time of

---

[3] "Severance" refers to the time the property ownership was divided. *See O'Hare v. Hulme*, 2020 WY 31, ¶ 31, 458 P.3d 1225, 1238 (Wyo. 2020); "Severance as element of easement by necessity," 28A C.J.S. *Easements* § 106, Westlaw (database updated May 2025).

severance, Neil Clark's property was owned by Mrs. Clark. The Clarks did not introduce evidence that access via County Road 12-123 would deprive them of the use of the southern property or would cause undue inconvenience or expense.[4] The district court did not clearly err when it found no implied easement because the Clarks did not establish necessity for an easement through Lot 4.

## *CONCLUSION*

[¶23] The district court did not clearly err when it concluded Mrs. Clark did not reserve an easement and there was no implied easement to access the southern property through Lot 4. We affirm.

---

[4] At trial, when asked whether there would be "considerable expense" to use an alternative access, Neil Clark responded in the affirmative but did not elaborate or produce additional evidence quantifying that expense.