Gretchen CAMPBELL, as personal representative for Thomas CAMPBELL, deceased; and the Estate of Thomas Campbell, deceased, Appellant (Plaintiff),

v.

STUDER, INC., a Wyoming corporation; Russell G. Sage, individually and as President of Studer, Inc.; Barbara L. Sage, individually and as Secretary of Studer, Inc.; NACCO Materials Handling Group, Inc., d/b/a Hyster Company, Appellees (Defendants).

No. 97–152.

Supreme Court of Wyoming.

Dec. 18, 1998.

Robert W. Horn and Vonde M. Smith of Robert W. Horn,. P.C., Jackson, WY. Argument presented by Ms. Smith, Representing Appellant.

Jeffrey C. Brinkerhoff and Keith M. Aurzada of Brown, Drew, Massey & Sullivan, Casper, WY. Argument presented by Mr. Brinkerhoff, Representing Appellees.

Before LEHMAN, C.J., and THOMAS, GOLDEN, and TAYLOR,* JJ., and DONNELL, D.J.

* Chief Justice at time of oral argument; retired November 2, 1998.

LEHMAN, Chief Justice.

Thomas Campbell was ejected from the seat of a road compactor, fell into its path, and later died from his injuries. Appellant Gretchen Campbell filed suit against appellees, the manufacturer and the distributor of the compactor, alleging defective design. She now appeals the summary judgment entered in favor of appellees, maintaining the district court erred in refusing to credit the testimony of her proposed expert that the compactor was unreasonably dangerous as designed. Finding no abuse of discretion in refusing to consider the expert's conclusions, we affirm.

### ISSUES

Campbell presents the following issues for review:

I. The trial court erroneously discounted the testimony of Plaintiff's expert testimony [sic] in its decision to dismiss Plaintiff's claims.

II. The trial court relied on improper evidence in each of its findings that Plaintiff failed to show that [the] product was unreasonably dangerous or that the manufacturer was negligent.

Appellees phrase the issues as:

1. Is qualified expert testimony necessary to withstand summary judgment in a strict products liability/negligent design case involving the design of a complex motorized piece of heavy construction equipment?

2. Did the trial court abuse its discretion when it found that Appellant's expert was not qualified to testify concerning the design and safety of a C530A, 12–ton, pneumatic-tired, diesel-powered, construction compactor when the "expert" has never designed any compactor, any similar vehicle, any motorized heavy equipment, any motor vehicle, or any component for a compactor and when he has not designed or tested for feasibility any of the components he recommends?

3. Did Appellant fail to present admissible evidence concerning her claims of a defective and unreasonably dangerous design, negligence, and causation?

### FACTS

On August 26, 1993, while operating a 12–ton Hyster C530A asphalt compactor, Thomas Campbell was apparently ejected from his seat when the compactor hit the rear end of his employer's truck. No one witnessed Mr. Campbell's fall, however a co-worker arrived to see the compactor, moving at full throttle in a counter-clockwise direction, run over Mr. Campbell. He died later that day from his injuries.

Mrs. Gretchen Campbell (Campbell) filed a wrongful death lawsuit on behalf of herself and the Campbells' two children and as representative of her late husband's estate, asserting claims for negligence and strict product liability. Campbell named as defendants Studer, Inc., the distributor that sold the compactor to Natrona County in 1971, and NACCO Materials Handling Group, the successor to Hyster Co., the manufacturer and designer of the compactor. Campbell claimed the design of the C530A was defective because it did not have safety equipment to keep the operator in the seat and it lacked an automatic shutoff device to stop the machine in case of operator ejection.

After extensive discovery, Studer and NACCO (collectively "appellees") moved for summary judgment. In support of this motion, appellees submitted the affidavit and deposition testimony of Mr. George Herbst, a mechanical engineer directly involved as the project engineer in the design, development and testing of the C530A. Mr. Herbst testified that the C530A was a self-propelled, pneumatic compactor, designed to compact asphalt or similar materials on smooth, flat, level surfaces such as highways, parking lots and airport runways. While compacting, the C530A is driven in a back and forth motion at speeds of three to five miles per hour. At top speed it can go approximately fifteen to seventeen miles an hour.

The design of the C530A introduced "articulated frame steering" and two side-mounted seats to enable the operator to move from seat to seat to more safely view the operations from either side while driving in forward or reverse. Prior to manufacture, the C530A prototype was tested for two years. Tilt, platform, and field tests demonstrated

that the machine was stable and posed no risk of operator ejection or rollover during its intended use. Before the manufacture of the C530A, six years of field experience with a nearly identical model did not indicate additional safety devices were needed. In the thirty years that the C530A and other similar cockpit designs have been in use, there have been no problems with "fore and aft" ejections other than Mr. Campbell's accident.

Addressing specific safety devices, Mr. Herbst testified that an automatic shutoff device was not practical or appropriate for the C530A. The operation of the C530A, a back and forth movement requiring uniform speeds for extended periods, dictates against a device which requires constant operator pressure that would add to fatigue, divert the operator's attention, and restrict operator movement from seat to seat for optimum visibility and control. An automatic shutdown of the C530A without continuous operator pressure would take a relatively complex system, and no such system had been designed or tested at the time the C530A was manufactured. Moreover, unintended shutdown poses several potential safety problems, including operator ejection and loss of steering capability.

Mr. Herbst further testified that seat belts were not incorporated into the design because, without a rollover protective structure (ROPS), seat belts can trap an operator in a rollover situation. At the time this machine was manufactured, the design of ROPS was in its infancy. There was no ROPS design developed for a pneumatic tire compactor; no manufacturer provided one on similar machines; and no regulation or standard required a ROPS on pneumatic compactors such as the C530A. Safety and operational concerns were also inherent in the utilization of ROPS and a seat belt on this machine, such as reduced access and egress, reduced access to the steering wheel, and a reduction in maneuverability and clearance.

The C530A design, later adopted by other manufacturers, is still used today and complies with all applicable industry safety standards and regulations. On the basis of the foregoing, Mr. Herbst concluded that the C530A was not defective and was more than reasonably safe for a consumer utilizing the machine as intended.

In response, Campbell submitted the deposition testimony of her expert, Mr. Robert Hathaway. Mr. Hathaway received a bachelor of science in electrical engineering in 1956, and for six months thereafter worked for the Army Corps of Engineers teaching the operation and maintenance of road building equipment. He also sold Ford farm and industrial equipment, designed electrical systems components for aerospace projects, and later designed instrumentation for the mining industry. None of the equipment associated with this work history included a compactor similar to the C530A.

Between 1975 and 1985, Mr. Hathaway was a consultant on corporate acquisitions for a steel company, analyzing "liabilities or problems" that may exist with the "product performance" of a company being considered for purchase. His consulting was limited to products associated with the steel industry, and during this time he did not design any heavy construction equipment or an operator cockpit for any piece of equipment.

Between 1985 and the time of his deposition, Mr. Hathaway was employed as a litigation consultant, providing product analysis and expert opinions. His experience with the design of the safety devices at issue in this case was derived from on-the-job training during this period of time. At the time of Mr. Hathaway's deposition, he had no formal education in mechanical engineering; he had never participated in the overall design of operator-controlled heavy construction equipment; he had never designed a shutoff control for heavy motorized equipment; and he had never personally seen or driven the C530A. Hathaway further admitted that he had not attempted to design or test an actual application of the safety devices he recommended to the C530A.

On this record, the district court found:

Plaintiff's expert has not been involved in the design of a compactor nor in the designs of any of the safety features for compactors, including the features he recommends for this machine. He has not tested this machine or a similar one. He

has not tested for feasibility of the changes he recommends. The expert witness for Defendants has done all of those things. Thus, Plaintiff's expert is not in a position to dispute the expert of Defendants, nor to raise issues of material fact.

The district court entered its order granting summary judgment for appellees, and Campbell timely filed this appeal.

### STANDARD OF REVIEW

Our recent statement pertaining to the standard for summary judgment review in negligence cases is appropriate to the facts of this case:

> Summary judgment is considered a drastic remedy because it operates to deprive a litigant of the right to trial. As such, it should only be granted with caution and restraint. This is particularly true in negligence cases.

> Appellate scrutiny of summary judgments necessitates a de novo review of the entire record, affording the opposing party the benefit of all favorable inferences to be drawn from that record. Thereafter, summary judgment shall not be affirmed unless no material fact remains in dispute and the moving party is entitled to judgment as a matter of law. Materiality is a function of a fact's capacity to establish or refute any essential element of a claim or defense thereto.

> When the party moving for summary judgment has established a prima facie case, the burden of production shifts to the opposing party who then is obliged to marshal admissible evidence, as opposed to general or conclusory allegations, establishing continuing viability of an issue of material fact. Such evidence must be competent and admissible, lest the rule permitting summary judgments be entirely evis-cerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation.

*Estate of Coleman v. Casper Concrete Co.*, 939 P.2d 233, 236 (Wyo.1997) (citations omitted).

 Campbell claims that summary judgment is dependent on the district court's refusal to accept the testimony of her expert as sufficient to establish a viable issue of material fact. A district court is vested with discretion to exclude expert testimony if it is deemed unnecessary or not helpful to the trier of the factual issues. *Hatch v. State Farm Fire & Casualty Co.*, 930 P.2d 382, 388–89 (Wyo.1997); *Lyden By and Through Lyden v. Winer*, 913 P.2d 451, 455 (Wyo. 1996). Such a determination will not be disturbed absent an abuse of discretion. *Id.*; *Kolb v. State*, 930 P.2d 1238, 1241 (Wyo. 1996). "In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did." *DJG v. MAP*, 883 P.2d 946, 947 (Wyo.1994) (quoting *Martinez v. State*, 611 P.2d 831, 838 (Wyo.1980)).

### DISCUSSION

 The "requirement of showing a defect is one element common to every products liability case." *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 64 (Wyo.1989) (quoting W. KIMBLE & R. LESHER, PRODUCTS LIABILITY § 53, at 69 (1979)). A defective product is a product which is "not reasonably safe," or is "unreasonably dangerous" to the user or consumer. *Id.*; *Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 344 (Wyo.1986). If a product is safe for normal handling and consumption, it is not defective. *Maxted v. Pacific Car & Foundry Co.*, 527 P.2d 832, 835 (Wyo.1974) (quoting RESTATEMENT (SECOND) TORTS § 402A(h) (1965)).[1]

---

1. We note the recent RESTATEMENT (THIRD) TORTS: PRODUCTS LIABILITY § 2(b) (1998) provides:

 § 2. Categories of Product Defect
 A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
 * * *
 (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

 The requirement that plaintiff show the existence of a reasonable alternative design as an element of her claim has been the subject of extensive debate. Comments b and e to this section, how-

The only testimony offered to refute appellees' evidence that the C530A was not defective is that of Mr. Hathaway. Expert testimony is the subject of W.R.E. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

It is not the purpose of W.R.E. 702 to provide for blanket admissibility of expert testimony. *Hatch,* 930 P.2d at 388; *Lyden,* 913 P.2d at 455; *Anderson v. Louisiana–Pacific,* 859 P.2d 85, 87 (Wyo.1993). Before ruling the testimony admissible, the trial court must determine that the witness has the "specialized knowledge" necessary to render an opinion on the subject, and that the opinion will assist the trier of fact. *Hatch,* 930 P.2d at 389; *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Engineers, Inc.,* 843 P.2d 1178, 1189–90 (Wyo.1992). "Whether the evidence assists the trier of fact is premised on the reliability of that evidence." *Springfield v. State,* 860 P.2d 435, 443 (Wyo.1993) (quoting *Frenzel v. State,* 849 P.2d 741, 750 (Wyo.1993)).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that when scientific expert testimony is offered, the trial court must perform a gatekeeping function to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799. Offering "general observations," the Court suggested that appropriate factors for the trial court's consideration may include "whether the scientific theory or technique: 1) can or has been tested; 2) has been the subject of publication or peer review; and 3) has a 'known or potential error rate.'" *Springfield,* 860 P.2d at 443, (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). As we stated in *Springfield,* "If

there is no proper foundation laid, then expert testimony does not 'assist' the jury in the search for the truth." *Id.* (quoting *Ferris v. Myers,* 625 P.2d 199, 204 (Wyo.1981)).

The district court compared this case to our decision in *Maxted v. Pacific Car & Foundry. Co.,* 527 P.2d 832 (Wyo.1974). There, the driver of a logging unit was injured when his trailer jackknifed, causing the tractor to roll. The driver filed suit, alleging the manufacturer and distributor of the tractor and trailer were liable under theories of negligence and strict product liability for failing to include a roll bar and padding in the design of the tractor, and failing to provide a device with which the driver could jettison the trailer in the event of an emergency. The district court granted summary judgment in favor of defendants on the jettison device claims because the driver failed to provide any evidence apart from his expert's conclusions, supported only by drawings and a small model, neither of which had been tested. We affirmed the district court on appeal, stating: "If categorical assertions of ultimate facts without supporting evidence could be used to defeat summary judgment, this procedure would have no viability." *Id.* at 834.

■ Like the district court, we can see no material distinction between the facts of this case and those of *Maxted.* Mr. Hathaway had no personal experience in the design or manufacture of the type of machinery at issue, and had no independent support for his conclusions based on "scientific principles." Although Mr. Hathaway asserted that the technology for an alternative design using seat belts was being incorporated into compactors for the Army Corps of Engineers prior to the manufacture of the C530A, he also testified that at the time the C530A was designed and manufactured, "the concept of ROPS was in its infancy" and "ROPS [were] not very practical because of the weight." When asked what he meant by that, Mr. Hathaway explained:

> A. Well, the reason that ROPS were not included for a long time on compactors is

---

ever, suggest an alternative design may not be necessary in every design defect case. We need not enter the debate at this time because Camp-

bell's allegations clearly rest on her contention that a feasible alternative design was available.

simply because of the structure required to make it strong enough to withstand the weight of the compactor, so for a long time they didn't—ROPS were not considered practical and they have since with design techniques and test codes come up with a way to make it practical, but there is one of the considerations in the early days why they didn't put ROPS on machines, on compactors, even when they were putting them on other machines.

Q. And certainly—I think you've already testified that you certainly should not have seat belts on a compactor without ROPS?

A. That's right.

Mr. Hathaway also stated that in 1965, when the C530A was designed, there were design criteria for ROPS for compactors, but not for the C530A, which was intended to work on relatively level and improved surfaces. Mr. Hathaway offered no testimony to indicate operator ejection was a known safety problem for the intended use of the C530A.

As to Mr. Hathaway's testimony on the necessity and feasibility of an automatic shutoff, he admitted he did not attempt to design or test a "deadman control" for this machine, but he had a design "concept." After explaining his concept, which involved an entire system of shutoffs, Mr. Hathaway stated:

> That's just—the only reason I throw that out—I haven't designed it, don't intend to present it as a design. It's a concept. * * * The reason I throw it out is to demonstrate the feasibility of a—what did I call it—deadman control.

We agree with the district court that Mr. Hathaway's "concept" is insufficient to refute Mr. Herbst's testimony or to create a genuine issue of material fact as to whether the lack of an automatic shutoff rendered the C530A defective. Not only was this "concept" untested in any way, Mr. Hathaway admitted he had made no effort to actually determine whether his "concept" could be designed, nor did he consider what other hazards may be created with the implementation of his concept.

In light of both the quality of Mr. Hathaway's experience with the subject matter at issue and the speculative nature of his testimony, his testimony lacked sufficient foundation to assist the jury. As such, the district court did not abuse its discretion when it discounted Mr. Hathaway's expert opinion.

Campbell also claims that the district court ignored the OSHA accident report which stated the opinion of the investigators that an automatic shutoff would have prevented the injury. This evidence, however, does not establish that such a switch was or is feasible for the C530A. Both OSHA investigators testified they had no formal training or direct experience in mechanical or design engineering for a motor vehicle or piece of heavy equipment, and no personal knowledge whether a shutoff system had ever been designed for equipment such as the C530A. Both investigators, however, stated there were no violations in the maintenance or condition of the compactor, and no requirement that the machine be fitted with an automatic shutoff switch.

■ The mere fact that an injury occurred is insufficient, in and of itself, to show the existence of a product defect. *West v. Deere & Co.*, 145 Ill.2d 177, 164 Ill.Dec. 122, 582 N.E.2d 685, 686 (Ill.1991); *Moomey v. Massey Ferguson, Inc.*, 429 F.2d 1184, 1186 (10th Cir.1970). "[A] party may not rely upon conclusions nor can they be employed in disposing of a motion for summary judgment." *Maxted,* 527 P.2d at 834. The plaintiff must offer some admissible evidence that the product was not reasonably safe for its intended or foreseeable use. *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276, 1281 (Wyo.1983); *O'Donnell v. City of Casper,* 696 P.2d 1278, 1286 (Wyo.1985); *Caldwell v. Yamaha Motor Co., Ltd.,* 648 P.2d 519, 525–26 (Wyo.1982). After careful review of the entire record, it is clear that Campbell's case rested entirely on unsupported speculation by Mr. Hathaway. Campbell presented no admissible evidence which would indicate that the C530A was not reasonably safe when designed and manufactured; and, therefore, the court properly granted summary judgment in favor of appellees.

### CONCLUSION

■ Other than the unsupported conclusory statements of Campbell's expert, no evi-

dence was presented which would establish, at the time of manufacture, the existence of a feasible, safer design for the C530A compactor. Further, Campbell failed to show that the absence of safety devices rendered the machine not reasonably safe for its foreseeable or intended use. Consequently, the district court's Order Granting Summary Judgment to All Defendants is affirmed.