# THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 16

OCTOBER TERM, A.D. 2024

February 3, 2025

SAMUEL MARTIN NANIA,

**Appellant
(Defendant),**

v.

S-24-0064

THE STATE OF WYOMING,

**Appellee
(Plaintiff).**

*Appeal from the District Court of Natrona County
The Honorable Kerri M. Johnson, Judge*

*Representing Appellant:*
> *Office of the State Public Defender: Brandon Todd Booth\*, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Jeremy Meerkreebs, Assistant Appellate Counsel. Argument by Mr. Meerkreebs.*

*Representing Appellee:*
> *Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.*

> *\*An Order Substituting Brandon Booth for Ryan Roden was entered on October 10, 2024.*

**Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.**

**FENN, J., delivers the opinion of the Court; BOOMGAARDEN, J., specially concurring, in which FOX, C.J., joins.**

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**Fenn, Justice.**

[¶1]    A jury convicted Samuel Nania of third-degree sexual assault.  On appeal, he claims the district court erred by excluding any reference to his polygraph examination during trial.  He argues the district court was required to analyze the reliability of the polygraph examination before it excluded this evidence.  We find Mr. Nania failed to show the district court abused its discretion or that he suffered any prejudice from the district court excluding his polygraph examination.  Accordingly, we affirm the district court's decision.

## ISSUE

[¶2]    Mr. Nania presents one issue, which we rephrase as follows: Did the district court abuse its discretion when it excluded evidence of Mr. Nania's polygraph examination?

## FACTS

[¶3]    On January 27, 2022, Mr. Nania went to the Hideaway bar in Mills, Wyoming, to meet with two of his ex-girlfriends, VR and KS.  After Mr. Nania left the bar, he began sending text messages to both ex-girlfriends about wanting to harm himself.  The ex-girlfriends were concerned, so they left the bar and went to Mr. Nania's residence to check on him.  When they arrived, Mr. Nania was asleep, so they woke him up.  Mr. Nania was angry VR and KS were at his residence.  However, because Mr. Nania continued to make threats of self-harm, both women stayed at the residence.

[¶4]    Around midnight, KS decided to leave because she had to work in the morning.  VR stayed at Mr. Nania's residence to make sure he did not harm himself.  VR plugged in her phone and changed into Mr. Nania's oversized t-shirt to get ready for bed.  VR told Mr. Nania they should go to bed.  She went into Mr. Nania's bedroom, wrapped herself in a blanket and laid on one side of the bed.  Mr. Nania came into the bedroom and laid on the other side of the bed.  He asked VR for a kiss, to snuggle, and if he could hug her, but VR responded no to all three of Mr. Nania's requests.

[¶5]    VR fell asleep but was awoken by Mr. Nania "grabb[ing] [her] arm and pull[ing] [her] across the bed[.]"  VR testified at this point she screamed for Mr. Nania to stop, but instead of stopping, Mr. Nania grabbed her by the wrists, held her wrists underneath her, and removed her underwear.  VR stated Mr. Nania put his whole body against hers and said he hoped he hurts her as much as she hurt him.  VR testified after Mr. Nania made this comment, he engaged in unwanted intercourse.  She stated she was able to get her feet on Mr. Nania's chest and kick him into the wall on the other side of the bed.

[¶6]    After kicking Mr. Nania off her, VR started crying and Mr. Nania started apologizing.  Both VR and Mr. Nania laid in bed until around 5:30 a.m. when Mr. Nania went to the kitchen and made coffee.  VR continued to lay in the bed until a little after 6:00

a.m. Mr. Nania and VR drank coffee, and Mr. Nania told VR "he was sorry, that he didn't mean to hurt [her], it wasn't his intention." VR told Mr. Nania she needed to go home to get ready for work, so she grabbed her phone and went home.

[¶7]   On her drive home, VR called KS to discuss what happened. During this phone call, KS told VR she had "pocket-dialed" KS in the middle of the night. This phone call lasted approximately four hours and KS overheard the incident between Mr. Nania and VR. Following her conversation with VR, KS received a text message from Mr. Nania. She replied to his message and stated she was going to go over to his residence. KS went over to Mr. Nania's home to get his version of the events she had overheard on the phone. KS recorded the conversation she had with Mr. Nania. During this conversation, Mr. Nania stated he remembered grabbing VR's arms and the tip of his penis getting wet but said he did not remember if he "was just slamming [VR] or just slamming [his penis] in her."

[¶8]   At some point, VR also called another friend who was an employee of Mr. Nania. After speaking with VR, this employee and her husband confronted Mr. Nania and asked Mr. Nania what happened between him and VR. Mr. Nania told the employee and her husband that he "raped" VR. He said he was mad, so he stuck his penis in VR, but she screamed, and he snapped out of it. Mr. Nania also said that he "wanted [VR] to feel the same pain that [he] had felt during [their] relationship."

[¶9]   After VR left Mr. Nania's residence, Mr. Nania sent her several text messages. In one of the text messages, Mr. Nania stated "I started to rape you. Out of anger." He also asked VR not to tell anyone and stated he would "Do anything to make amends." VR did not report the sexual assault to law enforcement until almost eight months later on September 27, 2022.

[¶10]  The investigating detective interviewed VR, Mr. Nania, and several other witnesses. Mr. Nania told the investigating officer he grabbed VR's arms, held her on the bed, and yelled at her. He said he thought his penis touched VR's vagina, but they did not have sex. Following the investigation, the State charged Mr. Nania with three counts of sexual assault. Mr. Nania was charged with one count of sexual assault or attempted sexual assault in the first degree, one count of sexual assault or attempted sexual assault in the second degree, and one count of sexual assault in the third degree.

[¶11]  Prior to trial, the State filed a motion in limine requesting the district court exclude any reference to a polygraph examination that was administered to Mr. Nania by an examiner chosen by the defense. The State asserted it did not stipulate to the admission of the polygraph examination, and polygraph examinations are inadmissible in Wyoming absent a stipulation. The State requested a hearing. Defense counsel admitted polygraph examinations are generally inadmissible if the requirements of *Daubert* are not satisfied. However, defense counsel argued the polygraph examination might be admissible if it is offered for a limited purpose such as rebutting or explaining other evidence or testimony

introduced by an adverse party. Defense counsel claimed the "polygraph examination produced 'passing' results on [Mr. Nania's] denials of the specific charges against him—meaning that 'no deception' was indicated when [Mr. Nania] denied the charges."

[¶12] The district court held a hearing on the motion in limine. It granted the State's motion and precluded any reference to the polygraph examination during trial. The district court held: "Under Wyoming law, polygraph testimony is inadmissible absent a stipulation by the parties[.]"

[¶13] Beginning July 31, 2023, a four-day jury trial was held. The jury found Mr. Nania not guilty of counts one and two—the first-degree and second-degree sexual assault/attempted sexual assault charges—and guilty of the third-degree sexual assault charge in count three. The jury found Mr. Nania committed third-degree sexual assault by "caus[ing] the submission of [VR] through means that would prevent resistance by a victim of ordinary resolution." The district court sentenced Mr. Nania to six to ten years in prison with credit for one day served. Mr. Nania timely appealed to this Court.

## STANDARD OF REVIEW

[¶14] "We review a district court's decision to admit or reject expert testimony for an abuse of discretion." *Bean v. State*, 2016 WY 48, ¶ 25, 373 P.3d 372, 381 (Wyo. 2016); *Dean v. State*, 2008 WY 124, ¶ 14, 194 P.3d 299, 303 (Wyo. 2008). "A decision to admit or reject expert testimony rests solely within the discretion of the district court and is not disturbed on appeal absent a clear showing of an abuse of discretion." *Dean*, ¶ 14, 194 P.3d at 303. The district court is given broad discretion when determining the reliability of expert testimony. *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999); *Bunting v. Jamieson*, 984 P.2d 467, 470 (Wyo. 1999)). "In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did." *Id.* (quoting *Campbell v. Studer*, 970 P.2d 389, 392 (Wyo. 1998)). "[A]s long as there exists a legitimate basis for the trial court's ruling," we will not reverse that decision on appeal. *Id.* (quoting *Bunting*, 984 P.2d at 470).

[¶15] If we find the district court abused its discretion in admitting or excluding evidence, or if the district court failed to conduct the required analysis, we next consider whether the error was prejudicial. *See Mitchell v. State*, 2020 WY 142, ¶¶ 17, 20, 476 P.3d 224, 231–32 (Wyo. 2020) ("[I]f we find error, or if the first prong is unreviewable because no analysis occurred, our inquiry turns to whether the admission was prejudicial."); *Toth v. State*, 2015 WY 86A, ¶ 35, 353 P.3d 696, 707 (Wyo. 2015) (quoting *Wise v. Ludlow*, 2015 WY 43, ¶ 42, 346 P.3d 1, 12 (Wyo. 2015)) ("Even when a trial court errs in an evidentiary ruling, we reverse only if the error was prejudicial."). To establish prejudicial error, the appellant "must show a reasonable probability that, without the error, the verdict might have been different." *Toth*, 2015 WY 86A, ¶ 35, 353 P.3d at 707 (quoting *Wise*, ¶ 42, 346 P.3d at 12).

## DISCUSSION

[¶16]  Mr. Nania claims the district court abused its discretion when it declined to admit his evidence of a polygraph examination.  He argues the district court erred when it held "[u]nder Wyoming law, polygraph testimony is inadmissible absent a stipulation by the parties[.]"  Mr. Nania further claims the district court's failure to hold a *Daubert* hearing before determining the inadmissibility of the polygraph examination leaves this Court with a record devoid of the testimonial evidence necessary to determine the admissibility of the polygraph examination.

[¶17]  "Absent a request by one of the parties, the law does not require that the trial court conduct a pretrial *Daubert* hearing." *Woods v. State*, 2017 WY 111, ¶ 30, 401 P.3d 962, 973 (Wyo. 2017) (citing *Chapman v. State*, 2001 WY 25, ¶ 23, 18 P.3d 1164, 1174 (Wyo. 2001)).  We have declined to "shackle the district court with a mandatory and explicit reliability proceeding" and instead assume the district court performed the required reliability "analysis *sub silencio* . . . with respect to all expert testimony." *Chapman*, ¶ 23, 18 P.3d at 1174 (internal citations and quotation marks omitted).

[¶18]  In *Hopkinson v. State*, we recognized a polygraph examination may be admissible evidence under certain circumstances. 632 P.2d 79, 138 (Wyo. 1981) (quoting *Cullin v. State*, 565 P.2d 445, 455 (Wyo. 1977)).  However, in that case, we deferred to the trial court's determination the polygraph examination was inadmissible because the appellant never made a formal offer of proof concerning the polygraph examination he wished to admit. *Id.* at 138–39.  We found the appellant failed to provide the necessary record to review the results of the exam or the qualifications of the examiner. *Id.*

[¶19]  Here, Mr. Nania never requested a *Daubert* hearing.  Instead, the State filed a motion in limine to exclude the polygraph examination and requested a hearing.  The district court held a hearing.  During the hearing, defense counsel stated:

> [W]e have a client who passed his polygraph, and it's not stipulated to by the State . . . but I think it really should be reviewed under Rule 702 as any other expert testimony.  And perhaps we're going to die on the field of reliability, but I think we need to have that conversation.  That's why [the polygraph expert] is here.  That's why we articulated some grounds for why these polygraph examinations, in fact, are reliable.  And I think [the polygraph expert] would testify they're more reliable when someone passes than when they fail; and I can speak from personal experiences, I've had many clients fail them.

\*     \*     \*

4

> And if this [c]ourt is interested, I have extra copies of [the polygraph expert's] report. [The polygraph expert] is here and ready to provide any testimony this [c]ourt would be interested in hearing. But other than that, I will stand on the pleadings.

[¶20] At no time during the proceedings below did Mr. Nania make a formal offer of proof concerning the results of his polygraph examination. Although Mr. Nania's pleadings set forth some of the polygraph expert's qualifications, background, and training, Mr. Nania failed to provide the expert's report or any information regarding the reliability of his polygraph examination. Additionally, Mr. Nania never requested the polygraph expert be allowed to testify during the hearing. Instead, Mr. Nania's pleadings stated the polygraph expert's "report itself can be made available to the [c]ourt upon request" and the expert was there should the court have any questions. In pleadings, defense counsel stated the "polygraph examination produced 'passing' results on [Mr. Nania's] denials of the specific charges against him—meaning that 'no deception' was indicated when [Mr. Nania] denied the charges." However, Mr. Nania did not produce the actual results, discuss what questions were asked during the polygraph examination, or explain what it meant that his results were "passing." Because Mr. Nania has presented us with a limited record and never made a formal offer of proof concerning the polygraph examination, we cannot say the district court abused its discretion in refusing to admit the polygraph examination, especially considering our precedent on the admissibility of polygraph examinations.

[¶21] In *Chapman v. State*, we acknowledged this Court adopted the federal *Daubert* model as guidance for imposing gatekeeping responsibilities on trial courts when determining whether scientific or technical expert testimony is admissible. 2001 WY 25, ¶ 8, 18 P.3d at 1169. However, in adopting the *Daubert* model we stated "we did not 'abandon our own precedent regarding the admissibility of expert testimony.'" *Id.* at ¶ 8, 18 P.3d at 1169 (quoting *Bunting*, 984 P.2d at 471). In our prior precedent, we reviewed whether it was error for a district court to admit a polygraph examination upon an agreement of the parties when the results indicated the defendant was being deceptive in answering three relevant questions. *Cullin*, 565 P.2d at 453–59. We found the trend in the law favored admissibility of a polygraph examination when the parties had stipulated to its admission. *Id.* at 457–58. However, we held even with the stipulation, the parties must still establish reasonable reliability before the polygraph examination could be admitted. *Id.* We also held the parties must establish the foundational qualifications for the expert, including establishing the probative value, the procedure followed in the polygraph test, the results, and the expert opinion. *Id.* In reaching our conclusion, we noted "none of our remarks should be construed to hold or to suggest that we hold polygraph evidence admissible in absence of a stipulation." *Id.* at 459.

[¶22] Following this holding, in *Schmunk v. State*, we stated:

> **Generally, the results of a polygraph examination are not admissible in evidence.** Improper reference to the results of a polygraph examination has been held reversible error. We have approved, upon stipulation of the parties, admission of the results of a polygraph examination. In the absence of a stipulation for admission, a conviction must be reversed when the results of a polygraph are revealed to the jury. The reluctance to admit the results of a polygraph or "lie detector" examination stems from the fact that the results of these examinations have not been established as reliable. It also stems from a fear that jurors may give too much weight to the results of the examination, even perhaps accepting it as proof of guilt or innocence.

714 P.2d 724, 731 (Wyo. 1986) (emphasis added) (citations omitted). In a later case, we acknowledged "[a] fundamental premise of our criminal trial system is that 'the jury is the lie detector.'" *Sullivan v. State*, 2011 WY 46, ¶ 19, 247 P.3d 879, 884 (Wyo. 2011) (quoting *United States v. Scheffer*, 523 U.S. 303, 313, 118 S. Ct. 1261, 1266, 140 L. Ed. 2d 413 (1998)). Furthermore, our long-standing rule is "an expert may not vouch for the truthfulness or credibility of an alleged victim or of any other witness." *Dean*, 2008 WY 124, ¶ 15, 194 P.3d at 304 (quoting *Seward v. State,* 2003 WY 116, ¶ 19, 76 P.3d 805, 814 (Wyo. 2003)).

[¶23] With this precedent in mind, it is understandable why the district court held the polygraph examination was inadmissible absent a stipulation by the parties without any further analysis on the reliability of Mr. Nania's polygraph examination. The limited record before us prevents any further evaluation or analysis. *See Hopkinson*, 632 P.2d at 138–39.

[¶24] Mr. Nania's appeal also fails on the prejudice prong. *See Sullivan*, 2011 WY 46, ¶¶ 19–22, 247 P.3d at 884–85 (reviewing for harmless error when the prosecutor remarked during trail about the defendant's decision not to take a polygraph examination). "Prejudicial error requires reversal, while harmless error does not." *Cox v. State*, 2020 WY 147, ¶ 16, 477 P.3d 82, 85 (Wyo. 2020) (quoting *Payseno v. State*, 2014 WY 108, ¶ 20, 332 P.3d 1176, 1182 (Wyo. 2014)). "An error is prejudicial when there is a reasonable probability . . . the result would have been more favorable to the defendant had the error not occurred." *Olson v. State*, 2023 WY 11, ¶ 18, 523 P.3d 910, 915 (Wyo. 2023) (quoting *Gilbert v. State*, 2022 WY 62, ¶ 38, 509 P.3d 928, 939 (Wyo. 2022)). We review the entire record to determine whether the defendant was prejudiced when the district court excluded certain evidence. *See id.* "Prejudice is not presumed, and the burden is on the appellant to demonstrate it." *Person v. State*, 2023 WY 26, ¶ 73, 526 P.3d 61, 79 (Wyo. 2023) (citation omitted). To find prejudicial error, Mr. Nania must establish a reasonable probability the

verdict would have been more favorable to him had his evidence been admitted. *See id.* at ¶ 75, 526 P.3d at 79; *Toth*, 2015 WY 86A, ¶¶ 40–41, 353 P.3d at 709.

[¶25]  Mr. Nania was acquitted of the charges of sexual assault in the first and second degrees, including attempted sexual assault in the first and second degrees, but was convicted of sexual assault in the third degree.  An individual commits sexual assault in the third degree if that individual "causes submission of the victim by any means that would prevent resistance by a victim of ordinary resolution" and "subjects a victim to sexual contact . . . without inflicting sexual intrusion on the victim and without causing serious bodily injury to the victim." Wyo. Stat. Ann. § 6-2-304(a)(iii) (LexisNexis 2021); Wyo. Stat. Ann. § 6-2-303(a)(ii) (LexisNexis 2021).  "'Sexual contact' means touching, with the intention of sexual arousal, gratification or abuse, of the victim's intimate parts by the actor[.]" Wyo. Stat. Ann. § 6-2-301(a)(vi) (LexisNexis 2021).  A defendant's intention of sexual arousal, gratification or abuse "may be proven by circumstantial evidence alone." *See Gonsalves v. State*, 2024 WY 49, ¶ 11, 547 P.3d 340, 343 (Wyo. 2024) (quoting *Morris v. State*, 2023 WY 4, ¶ 31, 523 P.3d 293, 299 (Wyo. 2023)); *Jackson v. State*, 2013 WY 130, ¶ 2, 311 P.3d 163, 164 (Wyo. 2013) ("[T]hird degree sexual assault requires proof of a[n] . . . intention of sexual arousal, gratification or abuse[.]").

[¶26]  Given the magnitude of the evidence against Mr. Nania, there is no reasonable probability the verdict would have been more favorable had the evidence he "passed" a polygraph examination been admitted.  The jury heard several of Mr. Nania's statements to multiple witness wherein he admitted to engaging in sexual contact with VR.  These statements also contained circumstantial evidence from which the jury could reasonably infer Mr. Nania acted with the intention of sexual arousal, gratification, or abuse.

[¶27]  In the very beginning of Mr. Nania's interview with law enforcement, which was played for the jury, he stated:

> She's staying the night, and we were laying in bed, we were completely naked and messing around getting ready to have sex and I said something that pissed her off.  And I can't remember what it was, and she got up and went to leave and I was trying to talk to her you know cause the relationship was up and down and crazy all the time.  And I grabbed her arms and held her on the bed and . . . yelled at her pretty much.  I think my penis touched her vagina.  I know that we did not have sex.

Mr. Nania further admitted that when he was holding VR down on the bed, he stated to her "I want you to feel the pain that I feel[.]"

7

[¶28]   KS testified to overhearing on the phone VR scream "super very loud, top of her lungs, bloodcurdling scream" and then saying "no, no, no, no, no, what the f\*\*\* are you doing."   She testified to hearing Mr. Nania immediately apologize and comment on whether VR was upset he tried to engage in intercourse.  The next day Mr. Nania and KS met in person, and KS recorded their meeting, which was also played for the jury.  In that recording, Mr. Nania revealed he did not remember what he did, but said "he realized [he] was being violent."  Mr. Nania further stated: "I remember reaching under her legs and grabbing her . . . and I feel like I forced something."

[¶29]   In addition to the statements Mr. Nania made in the recording to KS and in the recorded interview with law enforcement, Mr. Nania also told three additional witnesses he "raped" VR.  All three witnesses confirmed Mr. Nania used the term "rape" when explaining what he did to VR.  An additional fourth witness testified to text messaging Mr. Nania after hearing about the incident.  A screenshot of the text message conversation was admitted, and in that message Mr. Nania admitted to sexual contact with VR.

[¶30]   The jury also saw the text message stream between VR and Mr. Nania the morning immediately after the incident.  In those messages, Mr. Nania stated:

> I started to rape you.
>
> Out of anger.
>
> Please don't tell anyone.  I can't feel worse.
>
> I[']ll do anything to make amends.

VR testified to the incident and stated she was held down by Mr. Nania and that he tried to engage in unwanted sexual intercourse with her.

[¶31]   The only information in the record of the results of the polygraph examination are defense counsel's statements in the pleadings, which indicate the "polygraph examination produced 'passing' results on [Mr. Nania's] denials of the specific charges against him— meaning that 'no deception' was indicated when [Mr. Nania] denied the charges."  Mr. Nania's description of the polygraph fails to indicate whether he ever denied making any of the above statements to the law enforcement or the third-party witnesses, or whether he denied performing any of the above actions he himself admitted to committing.  Based on Mr. Nania's own statements, the third-party witnesses' testimony, and VR's testimony, we can find no reasonable probability the verdict would have been more favorable had the polygraph examination been admitted.  Mr. Nania has not met his burden showing the exclusion of this evidence resulted in prejudicial error.  Therefore, Mr. Nania has failed to meet his burden of showing the district court's decision justifies reversal of his conviction.

## CONCLUSION

[¶32]   Mr. Nania has not met his burden showing the district court abused its discretion in excluding Mr. Nania's polygraph examination, and he has not shown he was prejudiced by the district court's decision.  Affirmed.

**BOOMGAARDEN, Justice,** specially concurring, in which **FOX, Chief Justice,** joins.

[¶33]   I agree with the majority that Mr. Nania cannot show the district court's error was prejudicial, but I write separately because the district court abused its discretion by not applying a *Daubert* analysis to test the reliability of the polygraph evidence.

### I.      Federal Precedent Reconsidered Per Se Inadmissibility of Polygraphs Thirty Years Ago

[¶34]   The law around polygraph examinations is rooted in reliability.  In the early days of polygraphs, more than 100 years ago, the technology was new, not yet "well-recognized" or "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).  Even then, however, the D.C. Circuit recognized "[j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define" but the polygraph technology was "not yet" sufficiently recognized to be admissible.  *Id.* The *Frye* decision was a "not yet" rule, not a rule set up to last forever—as the technology developed and crossed the line from experimental to demonstrable polygraph evidence could become admissible.

[¶35]   *Frye* is no longer considered good law after the advent of Federal Rule of Evidence 702 and state analogues of that rule, having been expressly overturned in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588–90, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993).  The measure for the admissibility of scientific evidence is no longer its "general acceptance" in the scientific community.  *Id.* at 588.  Instead, scientific evidence is tested through a *Daubert* hearing for (1) reliability and (2) its relevance to the case at hand.  Wyoming expressly adopted the *Daubert* approach in *Bunting v. Jamieson*, 984 P.2d 467, 470–73 (Wyo. 1999) (adopting the two-part analysis from *Daubert*, 509 U.S. at 592–93 and related cases); *Seivewright v. State*, 7 P.3d 24, 29 (Wyo. 2000) (discussing the non-exclusive list of factors to guide the trial court's assessment of reliability).

[¶36]   Five years after *Daubert*, United States Supreme Court Justice Stevens, in a dissenting opinion, called for the courts to apply *Daubert* and Rule 702 to polygraph evidence to test reliability.  *U.S. v. Scheffer*, 523 U.S. 303, 331–39 (Stevens J., dissenting). He noted that when courts apply *Daubert*, even evidence of "shaky admissibility" is admitted and the proper course at trial to further test that evidence for the jury is through vigorous cross-examination.  *Id.* at 333–35.  He criticized the idea that juries would not be able to evaluate the credibility of the polygraph evidence—we task juries to test credibility in all sorts of cases.  *Id.* at 334–37.

[¶37]   The Tenth Circuit Court of Appeals and others heeded that call and now allow polygraph evidence, subject to *Daubert* to test the reliability of the evidence.  The Tenth

Circuit in *United States v. Call* set aside the per se rule of inadmissibility that was rooted in *Frye* and applied a *Daubert* analysis:

> Prior to *Daubert* we consistently held that polygraph testimony offered for the purpose of showing that one is truthful is inadmissible. In so holding, we applied a general acceptance test similar to the one set forth in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Under the *Frye* test, expert testimony based on a scientific technique was inadmissible unless the technique was generally accepted as reliable in the relevant scientific community. In *Daubert,* the Supreme Court rejected the general acceptance test, concluding that Rule 702 superseded the *Frye* test. *Daubert*, 509 U.S. at 587, 113 S.Ct. at 2793. Thus, in light of *Daubert*, our cases applying the *Frye* general acceptance test are no longer good law. Therefore, we may not apply the *Frye* test to determine the admissibility of polygraph evidence. Instead, we must apply the *Daubert* analysis.

129 F.3d 1402, 1404 (10th Cir. 1997) (some citations omitted). The Fifth and Ninth Circuits had already reached that conclusion, treating polygraph examinations like all other scientific evidence, subject to the *Daubert* analysis. *United States v. Posado*, 57 F.3d 428, 432–33 (5th Cir. 1995); *United States v. Cordoba*, 104 F.3d 225, 27 (9th Cir. 1997); *United States v. Benavidez-Benavidez*, 217 F.3d 720 (9th Cir. 2000). The Eleventh Circuit likewise followed suit, allowing polygraph evidence if it is sufficiently reliable and relevant under the *Daubert* analysis. *United States v. Henderson*, 409 F.3d 1293, 1301–04 (11th Cir. 2005).

[¶38] The Second Circuit recognizes the role *Daubert* may have when evaluating the admissibility of polygraph evidence but has not yet had a record sufficient to review the issue. *United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997). The Fifth Circuit likewise continues to apply a per se rule of inadmissibility for now, but it recognizes that "[a]fter *Daubert,* a per se rule is not viable," and "[t]here can be no doubt that tremendous advances have been made in polygraph instrumentation and technique in the years since *Frye.*" *United States v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995). Despite recognizing the role *Daubert* may have in evaluating the admissibility of polygraph evidence, the Fourth Circuit is waiting for the right opportunity to consider the issue, concluding "only the en banc Court has the authority to consider whether, '[a]fter *Daubert,* a per se rule is not viable.'" *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003) (quoting *Posado*, 57 F.3d at 433)).

## II.     *Other state courts' application of* **Daubert** *to polygraph testing*

[¶39]  Some state courts have applied *Daubert* to polygraph testing and reached varying results.  New Mexico applied *Daubert* to polygraph testing and concluded in *Lee v. Martinez*—after an extensive factor-by-factor analysis—that certain polygraph evidence was admissible.  96 P.3d 291, 306 (N.M. 2004).  It noted the parties' various concerns about polygraph evidence but reiterated the general rule of *Daubert* that "any doubt about the admissibility of scientific evidence should be resolved in favor of admission.  The remedy for the opponent of polygraph evidence is not exclusion; the remedy is cross-examination, presentation of rebuttal evidence, and argumentation."  *Id.* (citing *Daubert*, 509 U.S. at 596).  California reversed its per se rule excluding polygraph evidence and required  polygraph  evidence  to  be  considered  through  its  analogue  of  *Daubert*.  *Witherspoon v. Superior Court*, 133 Cal. App. 3d 24, 183 Cal.Rptr. 615 (Cal. 1982).  It only reinstated the per se rule of exclusion when the legislature enacted a rule of exclusion.  *People v. Wilkenson*, 94 P.3d 551, 564–66 (Cal. 2004).  Louisiana admits polygraph evidence in administrative proceedings.  *Evans v. DeRidder Municipal Fire Dept.*, 815 So.2d 61, 66–68, 71 (La. 2002).

[¶40]  States that continue to find polygraph evidence inadmissible do not necessarily follow a per se rule.  Rather, after applying *Daubert*, they have concluded the evidence fell short on the first, reliability prong.  For example, in *State v. Sharpe*, the Alaska Supreme Court evaluated a particular type of polygraph testing, comparative question testing (CQT),[1] under the factors governing reliability through *Daubert*.  It concluded CQT polygraph testing has "not been shown to satisfy the standard for scientific evidence set forth in *Daubert*. . . Our opinion here does not mean that CQT polygraph testing will never be sufficiently reliable to pass muster as scientific evidence[.]".  435 P.3d 887 (Alaska 2019).  South Carolina reached a similar conclusion but only after stating *Daubert* applies along with other rules—"admissibility of this type of scientific evidence should be analyzed under Rules 702 and 403 . . . After an analysis under these standards, we find the polygraph evidence inadmissible in this case."  *State v. Council*, 515 S.E. 2d 508, 519–20 (S.C. 1999).  *See also In re Robert R.*, 531 S.E.2d 301, 302–04 (S.C. Ct. App. 2000) (affirming *Council* and remanding for a *Daubert* hearing on the admissibility of polygraph evidence); *State v. Brown*, 948 P.2d 337, (Utah 1997) ("[T]he district judge recognized that there is no general acceptance of the polygraph, and he discussed several areas of concern including methodology, reliability, and the risk at trial of focusing on the credentials of the experts. The court also discussed the third step of [the analysis adopted in *Rimmsach¸* a state analogue of *Daubert*], that is, the danger of unfair prejudice under Utah Rule of Evidence 403. . . . We find that the trial court properly applied the *Rimmsach* tests and that the district court did not abuse its discretion in refusing to admit the polygraph results.").

[¶41]  Other state courts conclude polygraph evidence is inadmissible not because of a per se rule or *Daubert* criteria but because applying Rule 403, the probative value of the

---

[1] Mr. Nania's polygraph was also a CQT polygraph.

polygraph evidence is outweighed by other concerns. *State v. Brown*, 687 P.2d 751, 775 (Or. 1984) ("After carefully evaluating evidence and arguments for and against the introduction of polygraph evidence within the context of [Oregon Evidence Code] 401, 702, and 403, we conclude that the probative value of polygraph evidence is far outweighed by reasons for its exclusion."); *State v. Porter*, 698 A.2d 739, 743–77 (Conn. 1997) (evaluating polygraph evidence through an extensive *Daubert* analysis but continuing a per se rule of exclusion because the probative value was low and was outweighed by prejudicial effects effects); *Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 46 A.3d 891, 901 (Vt. 2012) (excluding polygraph evidence through Rule 403). *But see People v. Lyons*, 907 P.2d 708, 712 (Colo. App. 1995) ("[W]hile C.R.E. 702 applies to certain types of novel scientific evidence, the *Frye* test still applies to polygraph evidence").

### III. Wyoming's Polygraph Precedent in Cullin Directed Trial Courts to Consider Reliability, Subject to the Safeguards of W.R.E. 403

[¶42]   Our precedent from *Cullin v. State*, 565 P.2d 445, 455 (Wyo. 1977), was the first Wyoming case to meaningfully discuss the admissibility of polygraph results, but it did not adopt a bright line rule. It adopted a rule that hinged on reliability, based on a Tenth Circuit decision:

> However, we do not base admissibility of polygraph results solely upon the basis of the stipulation. **There should be some test of reasonable reliability before final admission by the judge**, even though the parties agree.  We see no real or unusual problem in that regard and believe that it can be accomplished through existing, accepted rules of evidence.
>
> The Tenth Circuit approached the problem in a practical way. In that case, the defendant offered evidence of a polygraph examination and to submit himself to a government polygraph test.  The court declared that in a proper case a polygraph test may be admissible but a foundation must be laid by relevant expert testimony relating to the probative value of such evidence and that before admission, the test is an accepted one in his profession and has a reasonable measure of precision in its indications.

*Id.* at 457 (emphasis added) (citations omitted).  Importantly, *Cullin* went on to state—"We must make it clear that in our consideration and discussion of the question, none of our remarks should be construed to hold or to suggest that we hold polygraph evidence admissible in the absence of a stipulation.  **That must wait for another day when the**

**question is directly before us**." *Id.* at 459 (emphasis added). Thus, the question of admissibility without a stipulation was left unanswered.

[¶43] Our subsequent cases did not adopt a per se rule excluding polygraph evidence. *Schmunk* addressed references made to polygraph testing, including a refusal to take a polygraph, and whether those references were reversible error. *Schmunk v. State*, 714 P.2d 724 (Wyo. 1986). We addressed the same issue in *Proffit v. State*, 193 P.3d 228, 233 (Wyo. 2008), when we described references to a refusal to take a polygraph test to be overzealous prosecution. In neither instance did we address the advancements of polygraph technology, the advancements in the law of evidence after *Daubert*, or the admissibility of polygraph evidence proffered by either party.

[¶44] Our decision in *Cullin* set the stage for polygraph evidence to be tested under the yet-to-be-established parameters of *Daubert*, just as the trial courts and parties test the reliability and relevance of other scientific expert testimony. We saw "no reason why the polygraph expert should be treated in any more restrictive manner than other experts." 565 P.2d at 458. We went on to prescribe that the trial courts must find a modicum of reliability for the polygraph evidence to have probative value, and that cross-examination and impeachment are the methods to "smoke[] out the inept, the unlearned, the inadequate self-styled expert." *Id.* We also recognized W.R.E. 403 as an umbrella of protection to exclude relevant evidence if its probative value is outweighed by prejudice, confusion or the risk of misleading. *Id.* We limited our analysis in *Cullin* to a polygraph the parties stipulated for admission, but our discussion did not close the door to unstipulated polygraph evidence. Rather, we expressly kept that door open "for another day when the question is directly before us." *Id.* at 459. The question is now directly before us.

[¶45] Mr. Nania sought to introduce his polygraph results either (1) as evidence of his innocence or (2) "for the limited purposes of rebutting the State's evidence of Defendants' various confessional statements and explaining those statements." When he asked the State to stipulate to the admission of what he considered to be exculpatory evidence, the State moved in limine to exclude that evidence as a matter of law, citing to *Schmunk* and *Proffitt*. The State also asked for a hearing on its motion. Two days later, and before Mr. Nania filed a response, the court set the State's motion in limine for a hearing. Defense counsel's response brief cited W.R.E. 702 and *Daubert* and fulsomely discussed how the proposed evidence met *Daubert*'s criteria of reliability and relevance. Once the hearing date arrived, Mr. Nania's expert was present and ready to testify for an evidentiary hearing.

[¶46] When faced with a W.R.E. 702 and *Daubert* issue, the district courts have discretion whether to hold an evidentiary hearing, hold an argument-only hearing, or have no hearing. *Seivewright*, 7 P.3d at 29–30. I do not conclude the district court abused its discretion by not taking testimony at the hearing or not continuing the matter for a longer evidentiary

hearing to hear the expert's testimony.[2]  We discussed the reasons a court may or may not hold such a hearing at some length in *Seivewright*.  7 P.3d at 29–30.  We have also upheld argument-only hearings.  *BNSF Ry. Co. v. Box Creek Min. Ltd. P'ship*, 2018 WY 67, ¶ 41, 420 P.3d 161, 170 (Wyo. 2018).  The district court abused its discretion because the court applied a per se rule of inadmissibility and did not analyze the proffered evidence for reliability and relevance under *Daubert* and its Wyoming progeny.

> The district courts maintain substantial discretion on *how* to evaluate the reliability of expert testimony and substantial discretion as to the *manner* they evaluate reliability.  However, there must be some analysis for this Court to review to determine that the trial court *did* conduct some sort of "gatekeeping" function under *Daubert/Bunting*.

*Id.*  Because the district court overlooked our instructions in *Cullin*—to test polygraph evidence for its reliability and relevance—and applied a per se rule which we did not adopt in *Cullin* or subsequently, the court abused its discretion.

[¶47]  I do not urge the adoption of a blanket rule of admissibility of polygraph evidence.  I urge only that Wyoming courts decline a per se rule of inadmissibility, instead adhering to our mandate in *Cullin* to consider such evidence for reliability and relevance, subject to exclusion through W.R.E. 403.  With our post-*Cullin* adoption of the *Daubert* structure to test such evidence through W.R.E. 702, we have ample precedent in place and reliability factors for the trial courts to use.

---

[2] Mr. Nania was not required to move separately for a hearing.  Under our civil rules, a party may request a hearing, W.R.C.P. 6(c)(4), but the trial courts have discretion whether to hold one.  *Seivewright*, 7 P.3d at 29–30.  This was a criminal case and motions practice is governed by W.R.Cr.P. 12 which is silent on a requirement that a party separately move for a hearing.  Moreover, in neither set of rules is there a suggestion that a party must move for a hearing after one has already been set by the court.  To require such a practice invites efficiency contrary to W.R.C.P. 1 and W.R.Cr.P. 2 (mandating the rules of procedure be applied to promote simplicity and efficiency and to reduce expense and delay).